**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ESTER MULET-RIVERA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | CIVIL ACTION NO. H-05-1850 |
| *versus* | § | |
| | § | |
| JO ANNE B. Barnhart, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Ester Mulet-Rivera's ("Rivera") and Defendant Jo

Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), cross-

motions for summary judgment. Rivera appeals the determination of an Administrative Law Judge

("ALJ") that she is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§

416(i), 423. Having reviewed the pending motions, the submissions of the parties, the pleadings,

the administrative record, and the applicable law, this Court is of the opinion that Rivera's Motion

for Summary Judgment (Docket Entry No. 14) should be denied, the Commissioner's Motion for

Summary Judgment (Docket Entry No. 15) should be granted, and the ALJ's decision denying

benefits should be affirmed.

**I.      *Background***

On May 26, 2000, Rivera filed an application for disability insurance benefits with the Social

Security Administration ("SSA"), claiming that she had been disabled and unable to work since

October 25, 1999.  (R. 59).  Rivera alleges that she suffers from fibromyalgia.[1]  (R. 12).  After being denied benefits initially and on reconsideration (R. 23-24, 27-30), Rivera requested an administrative hearing before an ALJ.  (R. 22).

A hearing was held on March 27, 2002, in Bellaire, Texas, at which time the ALJ heard testimony from Rivera, Byron Pettingill, Ph.D. ("Pettingill"), a vocational expert ("VE"), and Lloyd C. Jones, M.D. ("Dr. Jones"), a medical expert.  (R. 323-359).  In a decision dated April 17, 2002, the ALJ denied Rivera's application for benefits.  (R. 12-21).  On June 19, 2002, Rivera filed a Request for Review of Hearing Decision with the SSA's Office of Hearings and Appeals.  (R. 7). After receiving additional evidence from Rivera, on March 31, 2005, the Appeals Council denied Rivera's request to review the ALJ's determination.  (R. 3-6).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Rivera filed her original complaint in this case on May 24, 2005, seeking judicial review of the Commissioner's denial of her claim of benefits.  *See* Docket Entry No. 1.

II.       *Analysis*

A.       *Statutory Bases for Benefits*

 Social Security disability insurance benefits are authorized by Title II of the Social Security Act ("The Act") and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can

---

[1]  "Fibromyalgia" is pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 673 (29th ed. 2000).

collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortega v. Weinberger,* 516 F.2d 1005, 1007 n. 1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Rivera met the special earnings requirements on October 25, 1999, her alleged onset date, and continued to meet the requirements through the date of the ALJ's decision (*i.e.*, April 17, 2002), but not thereafter. (R. 19).  Consequently, to be eligible for disability benefits, Rivera  must prove that she was disabled on or before April 17, 2002.

Applicants seeking disability benefits under Title II must prove "disability" within the meaning of the Act.  Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. §423(d)(1)(A).

**B.**     ***Standard of Review***

**1.**     ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party is entitled to a judgment as a matter of law if the nonmoving party fails to make  a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the

nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner's denial of denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices

or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id*.

**C.**    ***ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd v. Apfel*, 239 F.3d 698, 704-05 (5th Cir. 2001). The claimant has the burden to prove disability under the first four steps. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001). If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d

at 272; *Greenspan, v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165

(5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant met the special earnings requirements of the Social Security Act on October 25, 1999, the date she stated she became disabled, and continued to meet them through the date of this decision.

2.  The claimant has not engaged in substantial gainful work since the alleged onset date of disability.

3.  The claimant has fibromyalgia, a herniated disc, and a rotator cuff impingement syndrome, severe impairments. She has a depressive disorder,[2] non-severe impairment. She does not have an impairment or combination of impairments that meets or equals in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulation No. 4.

4.  The claimant's testimony was not fully credible or consistent with the record considered as a whole.

5.  The claimant has the residual functional capacity to perform sedentary work.

---

[2] "Depressive Disorder" includes disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymic Disorder, Adjustment Disorder With Depressed Mood, or Adjustment Disorder With Mixed Anxiety and Depressed Mood. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (" DSM-IV-TR") 381 (4th ed. 2000).

(R. 19-20).  As to the fifth step, the ALJ concluded:

6.  The claimant does not have the residual functional capacity to perform her past relevant work.

7.  The claimant is 46 years of age, defined as a younger individual.

8.  The claimant has a high school equivalency education.

9.  In view of the claimant's medical-vocational profile, the issue of transferability of work skills is not determinative of this appeal.

10.  The claimant's medical-vocational profile corresponds with Rule 201.21, Appendix 2, Subpart P, Regulations No. 4, which directs a conclusion of not disabled. Based on this rule and considering the testimony of the vocational expert, jobs that the claimant is able to perform exist in significant numbers in the national economy. Examples of such unskilled sedentary jobs include small products assembler, assembler of electrical accessories, and hardware assembler.

11.  The claimant was not under a "disability," as defined in the Social Security Act at any time through the date of this decision.

(R. 20).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Rivera's claim for disability benefits is supported by substantial evidence, the Court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

>    **D.**    ***Issues Presented***

Rivera contends that substantial evidence does not support the findings of the ALJ. Specifically, Rivera argues that the ALJ erred by:  (1) failing to give her treating physician's opinion controlling or great weight; (2) failing to properly consider Rivera's pain; and (3) finding that Rivera's depression was non-severe.  *See* Docket Entry No. 14.  The Commissioner maintains that the ALJ was correct in not giving controlling weight to Dr. Harvey's medical opinion because the opinion was inconsistent with other evidence of record and was not sufficiently supported by medically acceptable clinical and laboratory diagnostic techniques.  *See* Docket Entry No. 15.  The Commissioner also asserts that even if the ALJ failed to consider Rivera's pain, the SSA's lack of compliance with its own rules does not constitute reversible error absent a showing of prejudice to the claimant.  *See id.*  Finally, the Commissioner argues that the ALJ properly found that Rivera's mental impairment was not severe, as it did not impose more than slight abnormality on her ability to perform work activities.  *See id.*

>    **E.**    ***Review of ALJ's Decision***

>        **1.**    ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled

and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).

When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove that her impairment or combination of impairments matches or is equivalent to a listed impairment.  *See Zebley*, 493 U.S. at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See Zebley at 530*.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 404.1526(a). The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

20 C.F.R. § 404.1526(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357, 364 (5.th Cir. 1993).

A review of the medical records submitted in connection with Rivera's administrative hearing reveals that she suffers from fibromyalgia, a herniated disc, rotator cuff impingement syndrome, and a non-severe depressive disorder. (R. 20).

11

In 1995, Rivera was involved in a three-week pain management program for her fibromyalgia at the University Center for Pain Medicine and Rehabilitation at Herman Hospital ("Pain Center"). (R. 121, 124).  It was noted that Rivera showed considerable improvement following her treatment at the Pain Center.  (R. 124).

Rivera returned to the Pain Center in January 1999 for treatment.  On January 27, 1999, Rivera was treated by Michelle Bricker, M.D. ("Dr. Bricker").  (R. 127-129).  On physical examination, Dr. Bricker reported that Rivera was a "well developed, well-nourished, middle-aged woman in no overt, acute distress."  (R. 128).  Dr. Bricker observed that Rivera has "symmetric muscle bulk and tone," and that Rivera's major joint mobility was intact.  (128-129).  Dr. Bricker also noted that Rivera responded well to Ultram,[3] which was prescribed by Rivera's treating physician Debra Harvey, M.D. ("Dr. Harvey").  (R. 129).  Dr. Bricker reported that after Rivera was treated with Ultram, she "remained pain free for almost a year, but has had insidious progressions of pain over the past six months."  (R. 129).  Dr. Bricker's impression was that Rivera had "recurrent fibromyalgia and diffuse pain syndrome."  (R.129).  Dr. Bricker advised Rivera to continue use of her current medications and to resume taking Ultram, but cautioned Rivera not to exceed the maximum dosage.  Id.  Dr. Bricker also referred Rivera to psychological intervention for stress reduction and coping skills.  Id.  Finally, Dr. Bricker advised Rivera to pursue an active aerobic exercise program beginning with a walking regimen.  Id.

---

[3] "Ultram," a Duragesic, contains a high concentration of a potent Schedule II opioid agonist, fentanyl.  It is indicated for management of persistent, moderate to severe chronic pain that: requires continuous, around-the-clock opioid administration for an extended period of time, and cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate release opioids.  Warnings regarding misuse, abuse and diversion of opioids include the following: "Fentanyl is an opioid agonist of the morhphine-type.  Such drugs are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."  See PHYSICIANS' DESK REFERENCE 2448-2449 (60th ed. 2006).

On March 25, 1999, Rivera visited Dr. Harvey for a routine examination. (R. 273). Rivera's vital signs were stable. *Id.* Dr. Harvey noted that Rivera was feeling much better than on her last visit, and felt ready to return to work for full duty, except no standing for more than four hours. *Id.* He further reported that Rivera's neck, shoulder and arm pain had been "resolved." *Id.* Dr. Harvey also noted that Rivera had some low back and leg pains. *Id.* Dr. Harvey advised Rivera to: (1) continue medications; (2) perform low back exercises; and (3) continue her other exercise regimen as prescribed by the Pain Center. *Id.*

On June 24, 1999, Rivera visited Dr. Harvey to obtain medication refills and treatment for headaches, joint pain, and vaginal discharge. (R. 267). During this visit, Dr. Harvey noted that Rivera was "doing well on her current medication" for treatment of her fibromyalgia. *Id.* Dr. Harvey refilled Rivera's medicines and prescribed medication for the vaginal discharge. *Id.*

On October 19, 1999, Rivera visited Dr. Harvey as a result of "mal-odor to the urine, vaginal itching and discharge, and pain [in] the right shoulder." (R. 264). Dr. Harvey noted that Rivera was doing very well with her fibromyalgia using Ultram, Nortriptyline at night, and Prozac." *Id.* Dr. Harvey further reported that Rivera had "active range of motion" in the right shoulder, but forward elevation of the shoulder reproduced pain when the shoulder was elevated about 45 degrees. *Id.* Dr. Harvey diagnosed Rivera with the following conditions: (1) urinary tract infection with microscopic hematuria; (2) bacterial vaginosis; and (3) right shoulder pain with possibly some osteoarthritis.[4]

---

[4] "Osteoarthritis" is a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity. *See* DORLAND'S, *supra*, at 1286.

*Id.*  Dr. Harvey prescribed antibacterial medication to treat Rivera's vaginal infection and over-the-counter ibuprofen to treat Rivera's shoulder pain.  *Id.*

On October 25, 1999, Dr. Harvey performed  a physical examination on Rivera.  (R. 261). Dr. Harvey noted that Rivera's vital signs were stable; however, Rivera was observed to be "hypersensitive to touch, especially over her shoulders and upper extremities."  Dr. Harvey further reported that Rivera had "lots of muscle spasm[s] throughout her back and paraspinal muscles."  *Id.* It was noted that Rivera was taking more than the recommended dosage of her prescribed medications.  *Id.*  Dr. Harvey assessed Rivera's condition as fibromyalgia exacerbation, and prescribed additional medications to help alleviate Rivera's muscle spasms and anxiety.  *Id.*  Dr. Harvey advised Rivera to abstain from working for a period of one week so that she could be reevaluated.  *Id.*

On November 5, 1999, Rivera visited Joseph Rubin, M.D. ("Dr. Rubin") at the Pain Center. (R. 123-126).  Dr. Rubin performed a physical examination, noting that Rivera was "well developed, in no acute distress, but tearful."  (R. 124).  Under "Social History," Dr. Rubin reported that Rivera smoked half to one pack of cigarettes a day, denied using alcohol or drugs, but had a history in the 1970's of marijuana and cocaine use.  (R. 124, 128).  Under "Physical Examination," Dr. Rubin reported further that Rivera had "normal range of motion of the neck, back and all the joints, with generalized weakness and pain on movements, as per [Rivera]."  *Id.*  Dr. Rubin also noted that Rivera's muscle mass was "symmetric and within normal limits."  (R. 125).  Dr. Rubin reported that Rivera has "recurrent fibromyalgia and diffuse pain syndrome."  *Id*.  Dr. Rubin advised Rivera to increase her activity level, pursue an active aerobic exercise program, and obtain a physical therapy

14

evaluation and treatment. *Id*. Dr. Rubin also recommended that Rivera seek psychological intervention for stress reduction and coping skills. *Id*.

On November 18, 1999, a physical therapist at the Pain Center, Raj Riswadkar, P.T. ("Riswadkar"), performed an assessment of Rivera's condition, noting that Rivera "on observation had no problems," but that Rivera has "tenderness along the neck including the shoulder, arm, back, thigh and leg without any particular movement loss." (R. 121-122). Riswadkar noted that Rivera seemed to have diffuse pain; therefore, "[r]epeated test movements were not done [because Rivera] ha[d] pain while doing those." *Id*. Riswadkar recommended that [Rivera] be "seen for further treatment," and "given re-conditioning exercises as well as stretches to allow her to deal with her fibromyalgia pain." *Id.*

On November 23, 1999, Dr. Rubin reported in a "Letter of Medical Necessity" that Rivera's chronic fibromyalgia had worsened in the last six months. (R. 120). Dr. Rubin noted that Rivera's condition responded well after her treatment in 1995 at the Pain Center. *Id.* Because Rivera had a history of depression and her primary physician had prescribed antidepressants, Dr. Rubin recommended psychological intervention for stress reduction and coping skills. *Id.*

On December 1, 1999, Dr. Harvey examined Rivera noting that Rivera's vital signs were stable and her right shoulder was tender. (R. 248). Dr. Harvey noted that Rivera discontinued her dosage of Prozac at the recommendation of Donnie Hauser, M.D. ("Dr. Hauser"). *Id*. Dr. Harvey reported that Rivera was doing "a lot better," but she was still having a lot of pain, especially in the right shoulder and recently the left ankle had been hurting her. *Id*. An x–ray of Rivera's right shoulder showed no acute bone injury or destruction, and no soft tissue calcifications were noted. (R. 250).

On December 15, 1999, Rivera visited Dr. Harvey. (R. 247). Dr. Harvey noted that Rivera was "doing a little bit better," and was "not depressed at all." (R. 247). Dr. Harvey further noted that Rivera had pain in her left ankle and could not elevate her right shoulder without experiencing pain. *See id.* Upon physical examination of Rivera, Dr. Harvey observed that: (1) Rivera's vital signs were stable; (2) Rivera's shoulder was non-tender, and she had full passive range of motion but active range of motion was limited due to pain; and (3) Rivera walked with a limp due to pain in her left foot, but she had full range of motion and there was no tenderness/swelling of the joint, and no signs of any fracture or dislocation. *Id.* Dr. Harvey increased Rivera's dosage of Neurontin to three tablets for one week and noted that if the increased dosage did not provide Rivera with relief, she would increase the Nortriptyline to 150 mg. at bedtime. *Id.*

On January 5, 2000 Rivera was seen by Dr. Harvey. (R. 243). Dr. Harvey reported that Rivera's fibromyalgia was "doing better today," but that Rivera "still had some severe pain over the weekend." *Id.* Dr. Harvey referred Rivera to physical therapy and was of the opinion that Rivera could "anticipate going back to work in two to three weeks." *Id.*

On January 24, 2000, Rivera visited Dr. Harvey complaining of lower lateral back pain, burning urination, nausea and vomiting. (R. 239). According to Dr. Harvey, Rivera was using excessive amounts of narcotic medication, *i.e.*, hydrocodone, over the last two weeks, taking in excess of three times the prescribed dosage. (R. 236-239). Dr. Harvey noted that she refilled Rivera's prescription for Vicoprofen on January 17, 2000, giving her 60 of 7.5/200. (R. 236). Dr. Harvey reported that "[s]omehow, [Rivera] got another refill of the hydrocodone on January 22, 2000," and had already taken a third of those 60. (R. 236). On physical examination, Dr. Harvey observed that Rivera had muscle tenderness and muscle spasms from the shoulder down the lumbar

16

spine. *Id*. Dr. Harvey advised Rivera to decrease the use of the hydrocodone and that she would not refill the medication for her that week. (R. 236).

On January 31, 2000, Rivera returned to Dr. Harvey for a follow-up appointment, complaining of low back pain. (R. 232-33). A spine lumbar series x-ray revealed some osteophytes with no significant finding. (R. 234). Dr. Harvey noted that Rivera's back did not hurt when she was laying on her stomach or flat on her back, but it did hurt upon bending or changing positions. *Id*. At that time, she had stopped taking her medication for fibromyalgia. *Id*. Although at her previous visit Dr. Harvey had advised Rivera that she was using many narcotic medications and had told her not to use any more, Rivera told Dr. Harvey that she had taken some Darvocet given to her by a relative. *Id*. Dr. Harvey noted that Rivera had not attended the physical therapy prescribed previously, which could help with her back pain. (R. 233). Dr. Harvey prescribed Valium and Celebrex and recommended she go to physical therapy. *Id*. Dr. Harvey also recommended she continue to use her fibromyalgia medication. (R. 233).

On February 2, 2000, Rivera visited Jesse Chang, M.D., complaining of low back pain. (R. 225-226). On examination, Dr. Chang observed that Rivera's lower back had some mild discomfort with palpitation. (R. 225). Dr. Chang reported that Rivera had full range of motion and was ale to touch her toes from a standing position; her straight leg test was negative; and, she denied any pain radiation. (R. 225). Dr. Chang recommended extra strength Tylenol for pain control. (R. 226).

On February 7, 2000, Dr. Harvey performed a physical examination of Rivera, noting that Rivera had "full range of motion of all lower extremity muscles, with good reflexes and sensation." (R. 220-221). An x-ray of Rivera's spine reportedly revealed some mild degenerative change, but

no other problems were noted. (R. 220). Dr. Harvey observed that Rivera's back was "without tenderness," but that Rivera had a decreased range of motion of the back, due to back pain in all directions. *Id*. Dr. Harvey advised Rivera to stop the Valium and any other medication that she was taking, except to continue the Nortriptyline and Prozac 20 mg. Daily. (R. 221). Dr. Harvey recommended that Rivera consult with a neurologist regarding her back pain. (R. 219, 221).

The following day, February 8, 2000, Rivera visited neurologist Frank M. Yatsu, M.D. ("Dr. Yatsu") for a consultation. (R. 216-218). Under past medical history, Dr. Yatsu noted that Rivera contracted Hepatitis C in the 1970's after IV drug use, which was successfully treated with Interferon. (R. 216). Dr. Yatsu noted that Rivera was alert and oriented, but had obvious pain with certain movements such as flexion of her thighs. (R. 217). Dr. Yatsu also noted that Rivera's coordination was normal, and that motor testing showed 5/5 strength throughout. *Id*. Dr. Yatsu was of the opinion that Rivera had "low back syndrome." *Id*. Dr. Yatsu recommended that an MRI be taken of Rivera's lumbrosacral spine. *Id*.

On February 15, 2000, Rivera had an MRI on her spine, which revealed central disk herniation at L4-5, which was producing compression of the thecal sac. (R. 210). It was further noted that there was mild narrowing of the vertebral foramina without compression of the nerve roots. (R. 210). To treat Rivera's disk herniation, Dr. Harvey added a physical therapy regimen for disk herniation to her treatment plan. (R. 204-205). Dr. Harvey noted that Rivera needs to "continue to be off work for at least another three weeks so that physical therapy can do some more work with her back." *Id*. On March 6, 2000, Rivera was examined by Dr. Harvey. (R. 198-199). Dr. Harvey noted that Rivera had "full range of motion of her extremities," and that Rivera's back had some

limited range of motion.  (R. 198).  Dr. Harvey advised Rivera to continue with physical therapy and medications.  (R. 199).

On March 20, 2000, Rivera visited Dr. Harvey to obtain a follow-up examination.  (R. 193-194).  Dr. Harvey noted that Rivera had recently traveled to Hawaii.  *Id*.  Dr. Harvey also reported that Rivera was experiencing mild point tenderness in her right shoulder, but not severe; she had full range of motion.  *Id*.  Dr. Harvey noted that Rivera's pain was exacerbated by reaching and pulling and pushing with Rivera's right arm, or any extended standing for more than an hour.  *Id*.  Dr. Harvey also reported that Rivera's disk herniation was doing much better due to physical therapy treatment.  (R. 194).  On a physician's status report to Rivera's employer, Dr. Harvey diagnosed Rivera with fibromyalgia with severe chronic pain and herniated lumbar disk L4-5.  (R. 207).  Dr. Harvey noted that Rivera could return to work with the following restrictions:  (1) no standing more than about an hour a day, mostly sitting work; (2) no reaching, pulling or pushing, especially with the right arm; (3) six to eight hours of work per day at five days per week; (4) no lifting over 10 pounds; and (5) no stooping/bending, or use of vibrating tools.  (R. 194, 207).

On April 17, 2000, Rivera visited Dr. Harvey to obtain a follow-up examination.  (R. 184).  Dr. Harvey reported that Rivera had been off work since October, was doing much better,  and was ready to return to work with only minimal restrictions."  *Id*.  Dr. Harvey advised Rivera to continue with her current medications.  *Id*.

On July 24, 2000, Rivera was examined by Dr. Harvey during a routine follow-up visit.  (R. 165).  Dr. Harvey reported that Rivera's vital signs were stable and concluded that Rivera should continue with current medication to treat her fibromyalgia.  *Id*.  Rivera reported that she had more relief of her depression with the medication Zoloft, but had run out it.  *Id*.

On August 31, 2000, Rivera visited Dr. Harvey, at which time Dr. Harvey noted that Rivera had "full range of motion of her shoulder and leg," and advised Rivera to continue her current treatment regimen for her fibromyalgia condition.  (R. 158).

On September 19, 2000, Eugenia G. Goodman, M.D. ("Dr. Goodman") evaluated Rivera's functional capacity for the SSA, finding that Rivera could lift and carry 25 pounds frequently and 50 pounds occasionally; stand and/or walk about 6 hours of an 8 hour work day; sit about 6 hours of a work day; and frequently climb, balance, kneel, crawl and, occasionally stoop and crouch.  (R. 276-283).  Dr. Goodman further reported that the "alleged limitations caused by the clmt (sic) symptoms not fully supported by the medically objective evidence."  (R. 281).  Dr. Goodman's assessment was affirmed by Scott D. Spoor, M.D. ("Dr. Spoor"), on February 22, 2001.  (R. 283).

On October 13, 2000, Dr. Harvey noted that Rivera had "fibromyalgia with increasing pain." (R. 144).  Dr. Harvey observed that Rivera had pain and tenderness across her shoulders, but she still had full range of motion.  *Id.*  Dr. Harvey's recommended the following treatment plan for Rivera: (1) water therapy; (2) physical therapy; (3) continue medication of hydrocodone, with a decreased dosage of Ultram; (4) restart the dosage of Neurontin; and (5) recheck Rivera's Hepatitis C, as she had been in remission since 1990.  *Id.*

On November 16, 2000, Rivera visited Dr. Harvey.  (R. 139).  Dr. Harvey noted that Rivera had full range of motion in her right shoulder, but experienced discomfort when her shoulder was flexed.  *Id.*  Dr. Harvey also reported that Rivera experienced pain and had tender points in her hips and lower back.  *Id.*  Dr. Harvey reported that Rivera was taking the maximum dosage of Ultram and sometimes more, but ran out of it in the last ten days.  *Id.*  During this visit, Dr. Harvey diagnosed

Rivera's condition as "fibromyalgia with severe shoulder pain." *Id*. Dr. Harvey prescribed various

pain and antidepressant medications to help alleviate Rivera's condition. *Id*.

Rivera visited Dr. Harvey several times in January 2001. On January 4, 2001, Rivera was

seen by Dr. Harvey on a routine follow-up visit and medication refill. (R. 320-321). Dr. Harvey

reported that Rivera had typical examination findings consistent with fibromyalgia. (R. 320). She

identified several tender trigger points. (R. 320). Dr. Rivera opined that "at least 90% of [Rivera's]

time [was] spent in pain, and [she was] unable to do anything strenuous as far as lifting, reaching

above her head, stooping over. . . ." (R. 321). Dr. Harvey further reported that Rivera "was

requiring frequent breaks at work, and was on so much narcotic [medication] [she] did not feel like

it was safe for her to work." (R. 321).

During her January 4, 2001, visit, Dr. Harvey also noted that Rivera needed paperwork for

disability (R. 320), including questionnaires related to Rivera's ability to do work-related activities

from a physical and mental standpoint. (R. 308-312). From a physical standpoint, Dr. Harvey made

the following assessment as to Rivera's physical activities: lift/carry occasionally up to 20 pounds

and frequently 5-10 pounds; standing for 15-20 minutes without interruption, stand for 2 hours with

frequent breaks, and walk for 1 hour; sit for 1 hour without interruption and 5-6 hours with breaks;

frequently balance, occasionally climb, never stoop, couch, kneel, or crawl; rarely reach, push, or

pull; unable to operate moving machinery, tolerate extreme temperatures, or operate vibrating tools.

(R. 309). On the mental evaluation, Dr. Harvey was requested to indicate Rivera's degree of

limitation resulting from psychological factors. (R. 310). Dr. Harvey responded to the majority of

the questions (*i.e.*, 13 of 19) "none," meaning not present or having minimal limitation. (R. 310-

312). Dr. Harvey answered three questions as "slight" or mild limitation. *Id*. Finally, Dr. Harvey

noted to three questions in the area of sustained concentration and persistence that Rivera would have a "marked" or "extreme" limitation.  (R. 311).  Dr. Harvey noted that when Rivera has pain exacerbation that she would be unable to perform her job skills on an ordinary schedule and would have a decreased concentration.  *Id*.  With regards to the substance abuse portion of the questionnaire, Dr. Harvey responded that Rivera "does not abuse substances currently and has not in the last 3-5 years.  When she is in a lot of pain, she does use her pain medications to the limit." (R. 312).

On January 18, 2001, Dr. Harvey noted that Rivera continued to have pain in the same areas and trigger points in the same areas.  (R. 306).  Dr. Harvey prescribed a different pain medication to provide more relief.  *Id*.  Dr. Harvey further noted that Rivera "tends to take too much of the narcotic-Tylenol combinations."  *Id.*  On January 26, 2001, Dr. Harvey examined Rivera and noted that Rivera had some decreased active range of motion but full passive range of motion.  (R. 304).

On March 2, 2001, Dr. Harvey examined Rivera and noted that Rivera had a lot of pain in her bilateral shoulders and decreased range of motion.  (R. 301).  Dr. Harvey reported that Rivera appeared to be "maxed out on some of her medications."  *Id*.  Dr. Harvey noted that Rivera had a referral to the Pain Center but had reportedly felt so bad that she had difficulty following through with the referral.  *Id*.

On April 1, 2001, Dr. Harvey examined Rivera and reported that Rivera's fibromyalgia was better controlled.  (R. 299).  Dr. Harvey noted that Rivera had been doing much better since she went to the Pain Center.  *Id*.

On May 10, 2001, Dr. Harvey reported that Rivera was suffering from chronic pain secondary to fibromyalgia and disk herniation at L4-5.  (R. 297).  Dr. Harvey also observed that Rivera was

feeling quite a bit better and would benefit from physical therapy.  *Id*.  Dr. Harvey noted that Rivera had been referred to physical therapy four to six months ago but had been unable to attend reportedly due to severe pain.  *Id*.  Dr. Harvey referred Rivera back to the Pain Center for behavioral therapy, physical therapy, and medication refill.  *Id*.

On September 6, 2001, Rivera was examined by Dr. Harvey.  (R. 290-291).  Dr. Harvey noted that Rivera recently had a seizure from an overdose of taking too much Ultram.  (R. 290). During the seizure, Rivera allegedly hurt her right shoulder.  *Id*.  Dr. Harvey reported that Rivera had rotator cuff impingement syndrome and chronic pain secondary to fibromyalgia.  *Id*.  Although the Pain Center had prescribed Rivera Methadone, Rivera's insurance no longer "allow[ed] her to go there," and Dr. Harvey refused to prescribe Methadone for Rivera.  Dr. Harvey referred her back to the Pain Center and for an orthopedic consultation as well as adjusted her medication.  (R. 291).

On October 10, 2001, Rivera was examined by Dr. Harvey.  (R. 288).  Dr. Harvey reported that Rivera's rotator cuff impingement was doing much better.  *Id*.  Dr. Harvey noted that Rivera was "off the Methadone" and trying to decrease the use of her hydrocodone.  *Id*.  Dr. Harvey advised Rivera to continue with her current medications.  *Id.*

In a medical record dated November 8, 2001, Rivera claimed that she had no pain relief and admitted that she was "addicted to pain meds."  (R. 287).  Rivera complained of withdrawals from lack of Methadone.  (R. 287).  She was diagnosed with fibromyalgia and opioid tolerant/dependant. (R. 287).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*,

219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, Rivera asserts that the ALJ erred in failing to accord Dr. Harvey's opinions regarding Rivera's fibromyalgia controlling or great weight.  *See* Docket Entry No. 14.  Contrary to Rivera's allegations, the ALJ properly discounted Dr. Harvey's opinions as Dr. Harvey's January 5, 2000, responses to interrogatories pertaining to the criteria for the diagnosis for fibromyalgia were inconsistent with her treating notes.  (R. 13, 245-246).  As the ALJ correctly observed, in order to meet the diagnostic criteria for a diagnosis of fibromyalgia, an individual must have widespread pain in all four quadrants of their body for a minimum duration of three months and at least 11 of the 18

specified tender points.  (R. 13).  These 18 sites used for diagnosis cluster around the neck, shoulder, chest, hip, and elbow regions.  *Id.*

The record is replete with examples of inconsistencies between Dr. Harvey's treating notes and a diagnosis of fibromyalgia.  For example, an examination by Dr. Harvey in January 2000 indicated that Rivera had tenderness in the left CVA region with muscle spasm from the shoulder down the lumbar spine; however, the report failed to mention any other body parts.  (R. 236).  Another examination in January 2000 referred to mild tenderness in the spine with an assessment of low back pain, possibly sciatica, with no reference to fibromyalgia.  (R. 232-233).  A subsequent examination dated February 7, 2000, revealed that Rivera's back was without tenderness, and there was no mention of tenderness in other parts of the body.  (R. 220).

In February 2000, Dr. Yatsu examined Rivera, noting marked paraspinal spasm in the lumbar region.  (R. 216-218).  Dr. Yatsu did not mention tenderness, tender points, or trigger points in any other part of her body.  *Id*.  Dr. Yatsu diagnosed Rivera with low back syndrome.  (R. 217).  An examination by Dr. Harvey in March 2000 revealed some tenderness in her right shoulder, but no other body part was mentioned.  (R. 193).  Although no examination was done in August 2000, it was noted that Rivera had full range of motion of her shoulder and leg.  (R. 158).  In October 2000, Dr. Harvey reported that Rivera had pain and tenderness across her shoulders, but again, no other body parts were mentioned.  (R. 144).  When examined in November 2000, it was noted that Rivera had a lot of painful and tender points of the shoulders, hips, and lower back, but the examination did not document that Rivera had 11 specific tender points.  (R. 142).  Examinations dated January and March 2001, indicated that Rivera continued to have pain in the same areas and trigger points in the same areas.  (R. 301-302, 306).  In September 2001, only Rivera's right shoulder was examined, and

Rivera was diagnosed primarily with rotator cuff impingement syndrome as well as chronic pain due to fibromyalgia.  (R. 290-292).

As set forth above, Dr. Harvey's treating notes are inconsistent with a diagnosis of fibromyalgia because the examinations do not reflect that Rivera had at least 11 of the 18 specified tender points required to meet the diagnostic criteria for fibromyalgia.  Notwithstanding the questionable aspect of Dr. Harvey's diagnosis, the ALJ found that the one-time examination by Dr. Rubin in November 1999 was consistent with a diagnosis of fibromyalgia.  (R. 14).  The ALJ correctly noted, however, that there is no medical listing for fibromyalgia, and Rivera's condition as set forth in the medical records, did not equal in severity the requirements of any medical listing.  (R. 14, 335).  In this regard, Rivera's headaches were noted to be relieved with Tylenol or Advil (R. 17, 165).  Rivera reported that she had only had four or five intense headaches in the six months prior to June 20, 2001.  (R. 296).  Moreover, records of the physical therapist reflect that Rivera responded well to an aquatic exercise program. (R. 224).  Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling." *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).  Additionally, in a Supplemental Questionnaire, Rivera reported that medication helps her to move.  (R. 97).

Taking into consideration the medical evidence of record, as well as the testimony at the administrative hearing of Rivera and Dr. Jones, the ALJ fully developed the record and properly found that Rivera did not meet any Appendix 1 Listing.

2.    ***Subjective Complaints***

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*,

887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial

evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269

F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly

unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*,

925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is

disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at

128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as

inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir.

2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Rivera testified regarding her complaints of pain.  (R. 325-

333).  The ALJ determined that Rivera's subjective complaints were not credible.  (R. 19).  The

ALJ's decision indicates that he considered objective and subjective indicators related to the severity

of Rivera's pain:

> The reports from Dr. Harvey repeatedly refer to a diagnosis of fibromyalgia and the
> claimant's complaints of pain.  However, a treating note dated April 2000, 6 months
> after the alleged onset date, indicates that the claimant stated that she was ready to
> go back to work with only minimal restriction related to her back to prevent further
> injury to her back (Exhibit 2F, page 54).  A June 2000 treating note indicates that the
> claimant was described as "well appearing" (Exhibit 2F, page 47).  In April 2001 the
> claimant stated that on the average her pain was at a level 5 out of 10, and she
> described the character of the pain as achy (Exhibit 6F, page 14).  These notes
> suggest that the claimant's pain is not as severe as alleged.  The notes are generally
> silent with respect to complaints voiced by the claimant as to adverse effects from
> medications.
>
> A treating not dated July 2000 indicates that the claimant's headaches were usually
> relieved with Tylenol or Advil (Exhibit 2F, page 35).  In June 2001 she stated that

she had 4-5 intense headaches in the past ½ year (Exhibit 6F, page 10).   The claimant's headaches are not shown to be disabling.

(R. 17).   Moreover, in her disability application and testimony at the administrative hearing Rivera stated that she takes care of her personal needs, prepares her breakfast, makes her bed, lays down for 20-30 minutes, runs in place on a trampoline, reads, does needlepoint, puzzles, and cleans her house. (R. 98, 327).   Additionally, a treating note dated March 2000 indicated that Rivera took a trip to Hawaii.  (R. 193).   Treating notes in November and December 2000 also indicated that Rivera was going out-of-town.  (R. 134, 137).   Rivera's daily activities are not indicative of her allegations of severe pain.  *See Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990).

Based on a review of the entire record, the Court does not doubt that Rivera suffers from pain; however, the medical records do not support a finding that Rivera's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.   In March 2000, Dr. Harvey noted that Rivera had "full range of motion of her extremities," and advised Rivera to continue with physical therapy and medications.  (R. 198).   In April 2000, Dr. Harvey reported that Rivera was doing much better and that she was ready to return to work with only minimal restrictions related to her back to prevent further injury.  (R. 184).   In addition  to the treating notes cited, the record indicates that Rivera responded well to the treatment she received at the Pain Center.  (R. 124, 299).   Accordingly, there is substantial evidence that supports the ALJ's finding that Rivera's subjective reports of pain do not rise to the level of disability.  *See Ortiz v. Barnhart*, 70 Fed. Appx. 162, 164 (5th Cir. 2003); *Jones v. Barnhart*, 35 Fed. Appx. 390 (5th Cir. 2002).

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.  When a claimant's residual functional capacity is not

sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as "she is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*.  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity.  *See id*.  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .  RFC involves both exertional and non-exertional factors.  Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .   The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.   Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

### a.     *Physical Functional Capacity*

In the case at bar, the medical expert, Dr. Jones, testified that, based on his review of the record, Rivera was capable of performing a "medium work classification with restrictions."  Dr. Jones opined that Rivera should not engage in work that required her to crawl, climb more than two steps on a vertical ladder, work in exposed heights such as scaffolding, or bend and stoop for an extended period of time.  (R. 337).  The VE testified that Rivera's past relevant work as an electronics inspector and electronics assembler as both light and skilled jobs; her positions as a printed circuit board assembler and lab assistant were classified by the VE as both light and semi-skilled jobs.  (R. 75, 356).  Because the ALJ found that Rivera was limited to sedentary work, it was determined that Rivera could not perform her past relevant work.  (R. 19).  Thus, the ALJ had to

determine if there were other jobs existing in significant numbers in the national economy that Rivera could perform.

In this regard, in response to a hypothetical question posed by the ALJ, which included a physical capacity for sedentary work that did not involve working around moving or dangerous equipment, commercial driving, working at heights, or climbing, as well as Rivera's age, education, and work experience, the VE testified that such a person could perform the following unskilled, sedentary jobs:  small products assembler; assembler of electronic accessories, and hardware assembler.  (R. 357-358).  The VE stated testified that there were 1,500 (regionally) and 150,000 (nationally) jobs as a small products assembler.  (R. 358).  The VE also testified that there are about 1,000 and 100,000 jobs as an assembler of electronic accessories were available in the region and nation respectively.  *Id.*  With regards to the occupation of hardware assemblers, the VE stated that there were about 500 positions available regionally and about 50,000 positions available nationally.  *Id*.

Because the hypothetical questions articulated by the ALJ reasonably incorporated Rivera's impairments, the ALJ properly evaluated and accepted the VE's testimony.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  As such, there is sufficient evidence to support the ALJ's finding that Rivera has the residual functional capacity to perform sedentary work.

### b.      *Mental Functional Capacity*

Rivera argues that the ALJ erred in finding that her depression was non-severe.  *See* Docket Entry No. 14.  Although Dr. Harvey's treatment notes indicated that, at various times, she prescribed antidepressants, Dr. Harvey never placed any mental restrictions on Rivera.

Because Rivera's alleged mental impairment did not impose more than a slight abnormality on her ability to perform work activities, the ALJ correctly found that Rivera's alleged mental impairment was non-severe.

## III.   *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Rivera is not disabled.  Accordingly, it is therefore

**ORDERED** that Rivera's Motion for Summary Judgment (Docket Entry No. 14 ) is **DENIED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No.15) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this  22nd  day of June, 2006.

Calvin Botley
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ESTER MULET-RIVERA | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-1850 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**FINAL JUDGMENT**

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Plaintiff Ester Mulet-Rivera's Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**.  It is further

**ORDERED** that the Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), Motion for Summary Judgment (Docket Entry No. 15) is **GRANTED**.  It is finally

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this _____ day of June, 2006.


_____
CALVIN BOTLEY
United States Magistrate Judge